**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

NATIONAL ASSOCIATION OF HOME
INSPECTORS, a Minnesota Non-Profit
Corporation,

        Plaintiff,               Case No. 06-CV-11957

-vs-                      PAUL D. BORMAN
                           UNITED STATES DISTRICT JUDGE

NATIONAL ASSOCIATION OF
CERTIFIED HOME INSPECTORS,
a Colorado Corporation,

        Defendant.
_____/

**OPINION AND ORDER**
**(1) DENYING DEFENDANT'S MOTION TO DISMISS**
**FOR LACK OF PERSONAL JURISDICTION;**
**AND (2) DENYING DEFENDANT'S MOTION TO TRANSFER VENUE**

      Before the Court is Defendant's June 5, 2006 Motion to Dismiss for Lack of Personal

Jurisdiction and a Motion to Change of Venue. (Docket No. 8). Plaintiff filed its Response on

July 5, 2006. (Docket No. 11). Defendant filed its Reply to Plaintiff's Response on July 25,

2006. (Docket No. 12). The Court heard oral arguments on both of Defendant's motions on

October 25, 2006.

      Defendant also filed a Motion for an Evidentiary Hearing on its motions on July 25,

2006. (Docket No. 13). Plaintiff filed its Response on September 18, 2006. (Docket No. 19). The

Court denied Defendant's motion on October 24, 2006. (Docket No. 21).

      For the following reasons, the Court DENIES both of Defendant's motions.

# I.     BACKGROUND

## A.     Procedural

Plaintiff National Association of Home Inspectors ("NAHI"), a Minnesota non-profit corporation, filed its Complaint on April 26, 2006, against Defendant National Association of Certified Home Inspectors ("NACHI"), a Colorado non-profit corporation. NAHI requests various injunctive relief and monetary damages. NAHI alleges the following causes of action:

I.     Unfair Competition
II.    Trademark Infringement
III.   False Designation of Origin
IV.    Dilution
V.     False / Fraudulent Registration
VI.    Michigan Consumer Protection Act (state law)
VII.   Defamation / Injurious Falsehood (state law)
VIII.  Tortious Interference (state law)

## B.     Factual Allegations

NAHI is a Minnesota non-profit corporation with its principal place of business in Minneapolis, Minnesota, with chapter offices and members located throughout the United States and in Michigan. (Compl. ¶ 2). NACHI is incorporated in Colorado. (Compl. ¶ 3). NACHI has chapters and members located throughout the United States and does business in the State of Michigan. (Compl. ¶ 5).

NAHI alleges that the home inspection industry is primarily composed of individuals that conduct home inspections as sole proprietors, single-owner corporations, or limited liability companies. (Compl. ¶ 11). A home inspection typically consists of visual inspections of residential homes for apparent and visual defects. Many home inspections are conducted according to standards set by NAHI or the American Society of Home Inspectors. Home inspections are common in the industry and are typically performed on behalf of prospective

buyers. (Compl. ¶ 12). The Internet has become one of the primary marketing channels by many home inspectors and by home inspector associations on behalf of their members. (Compl. ¶ 14).

NAHI is a trade association and was incorporated as a non-profit in 1987. NAHI has over 2,400 members in all fifty (50) states and in Canada. (Compl. ¶ 15). NAHI has three different levels of home inspector membership with varying requirements: (1) Certified Real Estate Inspector, (2) Regular, and (3) Associate. (Compl. ¶¶ 16-18).

NACHI was formed by Nickifor Gromicko ("Gromicko") and Dennis Workman as a non-profit corporation in the State of Pennsylvania in 1998. (Compl. ¶ 19). For many years after its formation, NACHI had a very limited number of members, located primarily in Pennsylvania. (Compl. ¶ 20). Recently, Gromicko began to send unsolicited NACHI membership certificates to home inspectors across the United States. (Compl. ¶ 21). NACHI has also established several levels of membership with different requirements for each. (Compl. ¶ 22).

NAHI and NACHI are direct competitors for members and indirect competitors for home inspections. (Compl. ¶ 23). Both associations promote the business of their home inspector members to consumers and real estate industry professionals. The ability of each association to promote the business of their members is a direct factor in a home inspector's choice to belong to one or the other. (Compl. ¶ 24).

1.      Trademark Infringement and Unfair Competition – NAHI's Claims

NAHI claims that it has been using its trademarks "National Association of Home Inspectors" and "NAHI" continuously since 1987. (Compl. ¶ 25). NAHI has expended considerable resources in promoting, advertising, and developing its marks and has established considerable goodwill in the marks. (Compl. ¶ 27). NAHI asserts that its marks have become widely known and recognized throughout the country as a symbol of a high quality inspector

association and of high quality home inspections by its members. (Compl. ¶ 28). NAHI obtained

United States Patent and Trademark Office registrations for its mark "NAHI," plus design and

other related marks on May 27, 2003. (Compl. ¶ 30).

NAHI also claims that it has been using the symbol "NAHI CRI" as its certified real

estate inspector designation since approximately January 31, 1990. (Compl. ¶ 31). NAHI

obtained a United States Patent and Trademark Registration for that mark on May 27, 2003.

(Compl. ¶ 35). NAHI avers that it has spent considerable resources promoting, advertising, and

developing the NAHI CRI mark and has developed considerable goodwill in the mark. (Compl. ¶

32). It further claims that the mark is widely known and an invaluable assert to NAHI. (Compl.

¶¶ 33-34).

NAHI alleges that NACHI's use of the acronym "NACHI" has caused confusion,

mistake, and/or deception as to the affiliation, connection, or association of NACHI members

with NAHI and its members. (Compl. ¶ 45). NACHI has also been using NAHI's "CRI" mark in

promoting its services to the public, which has caused confusion as to the relationship between

the two entities. (Compl. ¶¶ 46-47).

Additionally, NACHI is infringing upon NAHI's mark by using the term "NACHI" in

NACHI's website, which is likely to cause to cause confusion among internet users. (Compl. ¶

48). In particular, NAHI claims that NACHI is infringing upon NAHI's mark by using the term

"NAHI" in the metatags[1] on NACHI's website. (Compl. ¶ 49). NAHI further claims that NACHI

is infringing upon NAHI's mark by and through NACHI's members using this mark directly on

website pages. (Compl. ¶ 50). As a result of using NAHI's marks on NACHI's website,

---

[1] A "metatag" contains key words that are used by internet search engines to find websites that are relevant to a searcher's inquiry. Metatags are typically embedded into the computer code or text by a web author or administrator. This code is hidden from the average viewer of a website. (Compl. ¶ 40).

consumers and home inspectors searching for "NAHI" on the internet are instead directed to NACHI's website. (Compl. ¶ 51).

NAHI also avers that NACHI has infringed upon NAHI's mark through agents of NACHI falsely identifying themselves as calling on behalf of NAHI in soliciting home inspectors for membership. (Compl. ¶ 52). NACHI and Gromicko have further infringed upon the NAHI mark by falsely identifying Gromicko as the "founder" of NAHI. (Compl. ¶ 53).

### 2. Fraudulent Conduct – NAHI's Claims

NAHI alleges that NACHI, through various internet websites and print media, represents to the home inspection industry, to real estate professionals, and to consumers that its members are "certified." (Compl. ¶ 56). NACHI also represents to the same groups that its home inspectors are the "best home inspectors" and "the most educated and best trained inspectors in the world." (Compl. ¶¶ 57-58). NACHI further represents through various media that it does not have multiple membership levels, when in reality it does. (Compl. ¶¶ 59, 65). NACHI encourages its members to represent themselves as "Certified Residential Inspectors" and "Certified Master Inspectors." (Compl. ¶ 60). NACHI also represents that it has many more home inspectors than it actually has. (Compl. ¶ 61). Contrary to prevailing ethical standard in the home inspection industry, NACHI represents to real estate professionals and consumers that NACHI's home inspectors do not perform repairs on houses, although NACHI's policies only prevents its members from performing repairs of specific items. (Compl. ¶ 62).

NACHI also has a practice of mailing unsolicited "membership certificates" to home inspectors, who are then considered NACHI members. (Compl. ¶ 64). Furthermore, NACHI solicits potential home inspectors by luring them to "get rich" by sending in a check for $289.00. (Compl. ¶ 63).

NACHI uses on online examination system that a person can take as many times as desired without cost and without any restriction on looking up answers, allowing individuals with no training or experience to pass the examination. (Compl. ¶¶ 67, 68). In the alternative, NACHI also accepts examinations on building codes, even though home inspectors generally do not inspect houses for code violations. (Compl. ¶ 66). NACHI represents to the industry and to the public that it turns down half of its applicants because they cannot pass the online test or do not meet other requirements. (Compl. ¶ 69). In essence, NAHI claims that one can become a member of NACHI and be considered a "certified real estate inspector" and be one of the "most educated and best trained inspectors in the world" even though that individual has limited or no training, has never conducted a home inspection, and pays the $289.00 fee. (Compl. ¶¶ 70-71).

Finally, NAHI alleges that NACHI has made false representations to the extent that:

(a)     Gromicko is the founder of NAHI;
(b)     NACHI's telephone solicitations inform the individual that it is calling from "NAHI";
(c)     NACHI is acting on behalf of NAHI;
(d)     NACHI has been in existence since 1990.

(Compl. ¶ 72).

3.     Defamation – NAHI's Claims

NAHI alleges that Gromicko and NACHI have made the following false and defamatory statements concerning NAHI and its members:

(a)     NAHI and its members engage in the bribery of real estate brokers or agents;
(b)     NACHI has purchased NAHI;
(c)     U.S. Inspect has purchased NAHI;
(d)     NAHI was history and folded;
(e)     NAHI died last year;
(f)     Civil Justice filed a lawsuit against NAHI and/or its member for bribing real estate agents.

(Compl. ¶ 73).

4.      Unfair Competition and Tortious Conduct – NAHI's Claims

NAHI claims that Gromicko and NACHI have been attempting to register all conceivable internet domain names that deal with the home inspection industry and often register these domain names under false identities. (Compl. ¶ 74). Gromicko and NACHI violate the rules of many internet search engines by using tens of thousands of domain names to increase the probability that an internet user would arrive at NACHI's site or a site of a NACHI member. (Compl. ¶ 75).

NAHI asserts that Gromicko and NACHI have in the past and are currently attempting to register multiple home inspector-related names as trademarks with the United States Patent and Trademark Office with the use of multiple false statements. (Compl. ¶ 76). After submitting these trademark applications, Gromicko and NACHI have been threatening NAHI member home inspectors with litigation, even though these inspectors are properly using the marks. (Compl. ¶ 77).

NAHI finally asserts that actions of Gromicko and NACHI have had the effect of interfering with the business relationship between NAHI and its own members and of coercing home inspectors to quit NAHI and to join NACHI. (Compl. ¶ 78). Finally, NAHI avers that Gromicko and NACHI have falsely informed real estate agents that NAHI members are acting unethically and unlawfully to interfere with business relationship between NAHI home inspectors and the real estate agents that provide them with referrals. (Compl. ¶ 79).

## II.    ANALYSIS

### A.    Defendant's Motion to Dismiss for Lack of Personal Jurisdiction

NACHI argues that the Court lacks personal jurisdiction over it. In particular NACHI argues that (1) the Court lacks general jurisdiction over the claims, (2) the Court lacks limited

jurisdiction over the claims, and (3) the Court's exercise of personal jurisdiction in this case would be unreasonable.

To avoid FRCP 12(b)(2) dismissal where there has been no evidentiary hearing, a plaintiff need only present a prima facie case for jurisdiction. *Audi AG & Volkswagen of America v. D'Amato*, 341 F. Supp. 2d 734, 741 (E.D. Mich. 2004). A court must consider all affidavits and pleadings in a light most favorable to plaintiffs and does not weigh the controverting assertions of the party seeking dismissal. *Id*. Where a court has not held an evidentiary hearing, a plaintiff must not simply stand on its pleadings, but must by affidavit *or otherwise*, set forth specific facts showing that the court has jurisdiction. *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991).

In order for the Court to exercise personal jurisdiction over NACHI, the "defendant must be amenable to suit under the forum's long-arm statute and the due process requirements of the Constitution." *Cole v. Mileti*, 133 F.3d 433, 438 (6th Cir. 1998).

Under Michigan law, existence of any of the following relationships between a corporation and state shall entitle the courts of the state to general personal jurisdiction over the corporation: (1) incorporation under the laws of [Michigan]; (2) consent, to the extent authorized by the consent and subject to the limitations provided in § 745; and (3) the carrying on of a continuous and systematic part of its general business within [Michigan]. MICH. COMP. LAWS. ANN. § 600.711. "The exercise of general jurisdiction is possible when a defendant's contacts with the forum state are of such nature and quality as to enable a court to adjudicate an action against the defendant, even when the claim at issue does not arise out of the contacts with the forum state." *Electrolines, Inc. v. Prudential Assurance Co.*, 260 Mich. App. 144, 166 (2003).

MICH. COMP. LAWS ANN. § 600.715 describes the circumstances by which a Michigan court can exercise limited personal jurisdiction:

> The existence of any of the following relationships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation arising out of the act or acts which create any of the following relationships:
>
> (1) The transaction of any business within [Michigan].
> (2) The doing or causing any act to be done, or consequences to occur, in [Michigan] resulting in an action for tort.
> (3) The ownership, use, possession or any real or tangible personal property situated within this state.
> (4) Contracting to insure any person, property, or risk located within this state at the time of contracting.
> (5) Entering into a contract for services to be performed or for materials to be furnished in the state by the defendant.

The Sixth Circuit has held that § 600.715(1) is established by the slightest act of business in Michigan." *Neogen Corp. v. Neo Gen Screening*, 282 F.3d 883, 888 (6th Cir. 2002).

The Michigan Supreme Court has interpreted the state's long-arm statute to bestow the broadest possible grant of personal jurisdiction consistent with due process. *Sifers v. Horen*, 385 Mich. 195, 198-99 (1971). In order to comply with the Due Process clause, the plaintiff must establish that significant minimum contacts exist to satisfy "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310. 316 (1945). The Sixth Circuit has set forth the following three criteria to be satisfied before a court can exercise personal jurisdiction:

> (1) Defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state;
> (2) The cause of action must arise from the defendant's activities there;
> (3) Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum.

*Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 150 (6th Cir. 1997).

1.      General Jurisdiction

NACHI argues that it does not carry on a "continuous and systematic part of its general business within Michigan." NACHI does not have any chartered chapters in Michigan. (Pl. Br. p. 3). NACHI further claims it has no offices in Michigan; does not own or lease property in Michigan; maintains no mailing address or telephone listing in Michigan; has no employees who reside in Michigan; maintains no books, records, or bank accounts in Michigan; and pays no taxes in Michigan. (Def. Br. p. 3). NACHI does admit that it has approximately 261 members in Michigan, or roughly 3% of its total in North America. (Def. Br. p. 3).

NAHI counters that in addition to the 3% of its members in Michigan, NACHI also derives 3% of its annual dues from Michigan members. Furthermore, NAHI claims that NACHI has multiple chapters in Michigan, has certified courses at Macomb County Community College, attempted to influence Michigan legislation on statewide home inspection, operates an online "mall" to sell its products and services over the internet, and has offered to train new inspectors in Michigan while stating that it will assign them specific territories in Michigan. (Pl. Reply p. 11-12).

The Court need not in this instance determine whether NACHI's activities in Michigan are a "continuous and systematic part of its general business" for the purposes of general jurisdiction, since the Court finds that NACHI is subject to limited personal jurisdiction.

2.      Limited Personal Jurisdiction & Due Process

The Supreme Court has expressed that the "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). The Michigan Supreme Court has explained that "[p]urposeful availment is something akin to either a

10

deliberate undertaking to do or cause an act to be done in Michigan, or conduct which can be properly regarded as a prime generating cause of the effects resulting in Michigan, something more than a passive availment of Michigan opportunities. The defendant will have reason to foresee being 'haled before' a Michigan court." *Jeffrey v. Rapid America Corp.*, 448 Mich. 178, 187 (1995).

In the context of claims arising from the use of the internet, the interactivity of a website determines whether personal jurisdiction is appropriate for an out of state defendant. *D'Amato*, 341 F. Supp. 2d at 742. Courts have stated that there are three categories of interactivity for websites: (1) purely passive sites that only offer information for the user to access; (2) active sties that clearly transact business and/or form contracts; and (3) hybrid or interactive sites that allow users to exchange information with the host computer. *Dedvukaj v. Maloney*, -- F. Supp. 2d --, 2006 WL 2520347, *6 (E.D. Mich. 2006). A "passive" website is insufficient to establish purposeful availment for the purpose of due process. *McGill v. Gourmet Techs, Inc.*, 300 F. Supp. 2d 501, 506-07 (E.D. Mich. 2004).

In *Neogen v. Neo Gen Screening*, 282 F.3d 883, the Sixth Circuit held that a Michigan district court could exercise personal jurisdiction over an out-of-state company on the basis of (1) the interactivity of the company's website and (2) other interactions with Michigan residents. The defendant was in the business of performing diagnostic testing of blood samples from newborn infants. *Id.* at 886. The vast majority of the defendant's business stemmed from contracts with hospitals and governmental agencies, none of which were located in Michigan. *Id.* However, individual physicians or coroners could contact the company by phone or by email to obtain filter blood collection forms. *Id.* The defendant would then mail the collection form to the customer. *Id.* The customer would then collect the blood sample and send it back to the company

with a preaddressed return envelope for testing. *Id*. The customer could obtain the test results either via mail or through the defendant's website with a password provided by the defendant. The defendant only tested fourteen (14) samples per year from individual Michigan customers. *Id*. at 887.

The court found that "the maintenance of a website, in and of itself, does not constitute purposeful availment of the privilege of acting in Michigan." *Id*. at 890. Nevertheless, the court stated that the use of passwords to provide test results as a part of a contract for the defendant's services showed that the defendant had "intentionally reached out to Michigan customers and enabled them to use [the defendant's] services from Michigan." *Id*. at 891. The court further held significant that the defendant stated on its website that it would "do a genetic newborn screening test for any parent in any state" and contained a geographical breakdown of data that expressly included Michigan. *Id*. Lastly, the website allowed users to download collection forms directly from the website to send along with payment. *Id*.

Since whether the defendant's website alone provided sufficient basis for personal jurisdiction presented a "close question," the court examined the defendant's other contacts with Michigan. *Id*. The court held that the "proper test for personal jurisdiction is not based on a percentage of business analysis….but rather on whether the absolute amount of business conducted by [the defendant] represents something more than random, fortuitous, or attenuated contacts with the state." *Id*. at 891-92 (citation and internal quotations omitted). The court held that the defendant "could not mail test results to and accept payment from customers with Michigan addresses without intentionally choosing to conduct business in Michigan." *Id*. at 892. The court concluded that because the defendant "knew that it was doing business with Michigan customers, and performed part of is services in Michigan by mailing test results there and

providing special passwords to Michigan customers, [the defendant] could reasonably anticipate being haled into a court in Michigan." *Id*. at 892-93.

NACHI argues that its website is not sufficiently interactive for the Court's exercise of limited personal jurisdiction. First, NACHI introduces the affidavit of Christopher Morrell, the director of NACHI's department of information technology, that (1) NACHI's website does not permit the downloading and entering of contracts online; (2) NACHI's website does not permit online payment for membership dues or products; (3) the predominant purpose of the website is to provide information and to encourage the free exchange of ideas; and (4) out of 1,770 pages on the website, only forty-two (42) possess some interactive quality. (Def. Br. p. 14; Def. Ex. 2, Affidavit of Morrell ¶¶ 10, 15, 16). NACHI also claims that none of NAHI's allegations stem from the information on the website directed towards Michigan inspectors. (Def. Br. p. 15).

NAHI offers evidence that through NACHI's website, a prospective member can take an online "test," apply for membership online, including filling out a form of contract and paying membership fees online. (Pl. Br. p. 15; Pl. Ex. 6, NACHI Online Application). NAHI further introduces portions of NACHI's website that allow users to "shop online" at the "NACHI Mall" and utilize a wide range of interactive services. (Pl. Br. p. 15; Ex. 7, NACHI Mall). NAHI additionally avers that most of its claims against NACHI arise from the use of the website, including the violation of NAHI's trademark, unfair competition, and defamation. (Pl. Br. p. 15-16).

NACHI admits that it uses an online form for membership. (Def. Reply Br. p. 3). However, NACHI argues that it does not sell any of its own products online. According to

NACHI, its members, and not NACHI, offer the sale of goods and services on the website. (Def. Reply Br. p. 3).[2]

Upon inspection of the relevant portions of NACHI's internet site, there is no doubt that it contains the required degree of interactivity for the Court's exercise of limited personal jurisdiction. First, contrary to NACHI's averments that the website exists merely to provide "information" and to encourage the "free exchange of ideas," NACHI's website contains a full series of online examinations and other online requirements to become a NACHI "member."[3] Once the user completes all of the requirements, most if not all of which can be completed online, to become a member, a user must pay $289.00 and can do so via an online web credit card form, fax, or by mail.[4] Within twenty-four (24) hours of processing, NACHI purports to send emails providing the applicant a username and password for the website. NACHI also asks the applicant to provide twenty (20) zip codes in which he or she would want to work so that NACHI can enter the applicant into internet search engines. NACHI also mails applicants certificates and other important information.

Since NACHI's website is not the only interaction with the state, the Court must consider the website alongside NACHI's other interactions with Michigan residents. *Neogen*, 282 F.3d at 891. In particular, NAHI offers evidence of the following non-website related contacts that

---

[2]  See Welcome to the NACHI Mall, http://www.nachi.org/mall.htm (last visited Oct. 18, 2006). Although NACHI is correct that the vast majority of the links on the NACHI Mall page direct the user to external third-party commercial websites, some websites such as "ChooseNACHI.com" allows an online shopper to purchase inspection-related merchandise through another site called "Inspectormall.com" at a discount through NACHI affiliation. "NACHIMarket.com" offers its own marketed home inspector flashlight. "NACHIStore.com" offers other various home inspector-related items. NACHI further offers a NACHI WorldPoints Platinum credit card through a third party. See https://wwwa.applyonlinenow.com/USCCapp/Ctl/entry?sc=LR2T (last visited Oct. 18, 2006). All of these services are apparently available to Michigan residents.

[3]  See Become Certified. Join NACHI Today!, http://www.nachi.org/membership.htm (last visited Oct. 18, 2006).

[4]  See Join Today!, http://www.nachi.org/join.htm (last visited Oct. 18, 2006).

NACHI has with Michigan residents: (1) evidence of NACHI chapter meetings in Michigan (Pl. Br. Ex. 1); (2) NACHI's training and marketing presentations directed at home inspectors in Michigan; (3) NACHI certification of certain courses at Macomb County Community College (Pl. Br. Ex. 2); (4) NACHI's lobbying efforts in Michigan (Pl. Br. Ex. 3); (5) advertising for training services in the Detroit, MI market (Pl. Br. Ex. 4); (6) an internet offer to "Michigan NACHI members" for inclusion in certain print and internet directories that explicitly states that NACHI is "Serving: Southeast Michigan [and the] Greater Grand Rapids Area (Western Michigan)" (Pl. Br. Ex. 5).[5]

NACHI argues that NAHI's exhibits are not sufficient for this Court's exercise of personal jurisdiction. Despite NACHI's arguments, its website activities combined with its other activities in Michigan squarely falls into the situation contemplated by *Neogen*. NACHI is in the business of attracting, certifying, and supporting its home inspectors nationwide. Its website offers an online certification process, online payments, and a password-protected member login area. Once a user fulfills all of the requirements for membership, the applicant can provide twenty (20) preferred zip codes so that NACHI can market its members to a particular locality. NACHI further admits that its Michigan members constitute 3% percent of its total nationwide membership. As in *Neogen*, NACHI knew it was doing business with Michigan residents and performed part of its services by certifying members, mailing home inspection certificates, providing special passwords, and providing other means of professional support. In addition to the website, NAHI introduced evidence that NACHI advertised its services to Michigan residents, lobbied a Michigan state representative on local legislation, created a certification

---

[5]  See Offer to Michigan NACHI Members, http://www.2000www.nachi.org/documents/MichiganNachiDiscountOffer.pdf (last visited Oct. 18, 2006).

program at a Michigan community college, and sponsored various events dealing with home inspection topics.

The Court finds that the degree of interactivity of NACHI's website combined with the explicit targeting of Michigan residents through its promotional materials, chapter meetings, lobbying efforts, and event sponsorship clearly demonstrates that NACHI's contacts with the state are not "random, fortuitous, or attenuated." *Burger King*, 471 U.S. at 475.

> 3.      Reasonableness

NACHI argues that the Court's exercise of personal jurisdiction would not be reasonable in this instance, reiterating many of its arguments made above. In considering whether the exercise of jurisdiction is so unreasonable to violate notions of fair play and substantial justice, the court considers: (1) the burden on the defendant; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in receiving convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social polices. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). The Sixth Circuit has held "that an inference of reasonableness arises where the first two criteria [for personal jurisdiction] are met and that "only the unusual case will not meet this third criterion." *Theunissen*, 935 F.2d at 1461.

NACHI reiterates many of its arguments made above. For the reasons stated above, the Court does not find the exercise of jurisdiction to be unreasonable in this instance.

**B.      Defendant's Motion for a Change of Venue**

NACHI motions the Court to transfer venue to the federal district of Colorado pursuant to the Court's authority under 28 U.S.C. § 1404(a). It argues that NAHI has no particular

connection to Michigan to warrant deference to its choice of forum. (Def. Br. p. 18). NAHI's office, President, Executive Director, Membership Coordinator, and Director of Government Affairs are all in Minnesota. (Def. Br. p. 18). Only one of NAHI's eight directors resides in Michigan, and there are no allegations connecting that individual to this dispute. (Def. Br. p. 18).

NACHI contends that it also has no connection to Michigan. NACHI is incorporated in Colorado and conducts all of its business there. (Def. Br. p. 18). NACHI further argues that Michigan is an inconvenient location for the witnesses, distinguishing between the "raw" number of witnesses and the number of "key" witnesses. (Def. Br. p. 18). NACHI avers that the "critical" witnesses include Gromicko and Morrell. Gromicko resides in Colorado as well as all other NACHI fulltime employees. Morell resides in Pennsylvania and stated that Colorado would be more convenient for him than Michigan. (Def. Br. p. 18; Morrell Dec ¶ 21). NACHI further submits an affidavit from Deanna Willis who states that three other witnesses, crucial to refuting NAHI's case, reside in Colorado. (Def. Reply Br. p. 5).

Since NAHI's claims arise almost entirely from Gromicko's alleged conduct, NACHI argues that the "center of gravity" of the case is in Colorado. (Def. Br. p. 18-19). Moreover, NACHI claims that the Court should consider other factors, such as the availability of process to compel attendance of witnesses, the cost of obtaining willing witnesses, and "other practical problems associated with trying the case expeditiously and inexpensively because NACHI has no idea who NAHI's witnesses will be." (Def. Br. p. 19). Finally, NACHI argues that in the "interest of justice" the Court should transfer venue since NAHI has "purposefully avoided naming Gromicko as a defendant in this action so it would claim venue in Michigan…." (Def. Br. p. 19).

NAHI responds that a plaintiff's choice of forum is entitled to "great weight." (Pl. Br. p. 16). Furthermore, NAHI argues that the transfer in question would simply transfer the inconvenience from one party to another. (Pl. Br. p. 16).

NAHI further claims that despite the preferences of Gromicko and Morrell, a number of potential witnesses are located in Michigan. (Pl. Br. p. 17). Additionally, NAHI points out that the remaining seven NACHI directors live in Florida, Arizona, Wisconsin, Illinois, Virginia, California, and Minnesota. (Pl. Br. p. 17). NACHI has ninety-seven (97) members in Michigan, which represents three to four (3-4) percent of its membership, and a number of these individuals will likely be called as witnesses. Furthermore, at least one former member of NACHI is likely to testify to NACHI's unlawful acts. (Pl. Br. p. 17-18). NAHI avers that no matter where the action is filed, a large number of witnesses will be called from across the county. (Pl. Br. p. 18). Finally, NAHI claims that the only important witness in Colorado is Gromicko himself, and it is for his convenience that NACHI wishes to transfer venue. (Pl. Br. p. 18). NAHI finally argues that much of NACHI's electronic data is stored in New Jersey and in Pennsylvania. (Pl. Br. p. 19).

Since the Court has subject matter jurisdiction over NAHI's federal claims, 28 U.S.C. § 1391 is the appropriate venue statute. Section 1391 states in relevant part:

> (c)   For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced.

Furthermore, 28 U.S.C. § 1400(a) governs venue for the purposes of trademark infringement:

> Civil actions, suits, or proceedings arising under any Act of Congress relating to copyrights or exclusive rights in mask works or designs may be instituted in the district in which the defendant or his agent resides or may be found.

*See Mihalek Corp. v. State of Michigan*, 595 F. Supp. 903, 906-07 (E.D. Mich. 1984).

As discussed above, since the Court has personal jurisdiction over NACHI, venue is accordingly proper in the Eastern District of Michigan.

However, even if the Court finds venue to be proper in the Eastern District of Michigan, the Court retains wide discretion to transfer an action under 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought"). The parties do not dispute that this action could have been brought in the Colorado district court.

In ruling on a transfer of venue motion under § 1404(a), the Court must determine whether (1) the action could have been brought in the proposed transferee-court, (2) a transfer would promote the interests of justice, and (3) a transfer would serve the parties' and the witnesses' convenience. *D'Amato*, 341 F. Supp. 2d at 749 (citation and quotation omitted). The movant bears the burden of demonstrating that fairness and practicality strongly favor the forum to which transfer is sought. *Id.* (citation and quotation omitted). The movant must make this showing by a preponderance of the evidence. *Id.* (citation and quotation omitted).

In evaluating a motion to transfer venue, a district court considers the following factors: (1) the convenience of the parties; (2) the convenience of the witnesses, (3) the relative ease of access to the sources of proof; (4) the availability of process to compel attendance of unwilling witnesses; (5) the cost of obtaining willing witnesses; (6) the practical problems associated with trying the case most expeditiously and inexpensively; and (7) the interests of justice. *Helder v. Hitachi Power Tools, USA LTD.*, 764 F. Supp. 93, 96 (E.D. Mich. 1991). In short, a court may consider any factor that may make any eventual trial easy, expeditious, and inexpensive. *Id.* (citation and quotations omitted).

At the outset, NACHI argues that in this instance that the Court should not grant deference to NAHI's choice of forum since NAHI has little or no connection to Michigan. This Court has held previously that "where a plaintiff has little or no connection to the chosen forum…., the plaintiff's reason for choosing the forum – and remaining in the forum – is diminished and this should be given less weight." *D'Amato*, 341 F. Supp. 2d at 750.

a.      Convenience of the Parties and the Witnesses

The convenience of the witnesses is one of the most important factors in determining whether to grant a § 1404(a) motion. *Id*. Furthermore, the residence of "key" witnesses is more important for venue purposes than the raw number of witnesses. *Id*. "The moving party should generally provide each witness's name and the subject matter of the witness's anticipated testimony. *Id*. Finally, the "convenience of witnesses who are also employees is considered as part of a motion to transfer and is not discounted. *Id*. at 750-51. "Justice is best served, however, when the jury is permitted to view the most material witnesses." *Catalno v. BRI, Inc.*, 724 F. Supp. 1580, 1584 (E.D. Mich. 1989). The Court can also consider the possibility of testimony via de bene deposition for other witnesses. *Id*.

Neither party has gone into any great detail about the location of potential witnesses and the subject matter of their proposed testimony. Certainly, as NACHI points out, Gromicko's testimony will be necessary to the adjudication of the case. NACHI also offers the affidavit of Deanna Willis who states that there are other employees in the Colorado office that are necessary as well. (Def Reply Br. Ex. 4, Affidavit of Deanna Willis).

NAHI states that there are a number of material witnesses important to its case in Michigan, including (1) Mike Goewey, a member of NAHI's Board of Directors who is active in this litigation, and (2) Chuck McCann, a former NACHI member with knowledge of NACHI's

unlawful acts in Michigan. The remaining NAHI directors reside in Florida, Minnesota, Arizona, Wisconsin, Illinois, Virginia, and California. NAHI has not specified with any precision to what extent these witnesses are "key" for the purposes of its claim. Furthermore, with directors residing across the country, Michigan is not necessarily a more convenient forum for them than Colorado.

> b.    Access to the Sources of Proof

A fundamental principle guiding the Court's analysis of the access to the sources of proof is that litigation should proceed in that place where the case finds its center of gravity. *D'Amato*, 341 F. Supp. 2d at 751 (citation and quotations omitted). While the location of physical evidence such as the wreckage of a crashed plane ought to be given more weight in balancing the analysis under § 1404(a), the location of documentary evidence is a minor consideration." *Id.* (citation and quotation omitted).

NAHI points out, and the Court agrees, that the physical evidence in this case is most likely to consist of documents. Since documents, whether in paper or electronic form, are only a "minor consideration," this factor does not weigh in favor of granting NACHI's motion.

> c.    Other Factors

NACHI does not make any coherent argument as to the remaining factors for transfer under § 1404(a).

> d.    Case Law

NACHI cites two unpublished decisions out of the Western District of Michigan for the proposition that where the chosen venue is not the plaintiff's home state and where the operative facts occurred elsewhere, the plaintiff's choice is not entitled to deference. In *Tri-Con, Inc. v. Volvo Trucks North America*, No. 05-184, 2006 WL 1752411 (W.D. Mich. June 23, 2006)

(unpublished), the plaintiffs came from eleven different states and sued the defendant in the Western District of Michigan for breach of contract and injunctive remedies. *Id*. at *1, 5. Although the court found that it had personal jurisdiction over the defendant, it found venue improper and hence transferred the case to the Middle District of North Carolina, where the defendant was headquartered. *Id*. at *5. The court gave several reasons for its decision. First, the court found that none of the plaintiffs resided in Michigan, had purchased his or her truck in Michigan, had the trucks serviced in Michigan, or signed any contracts in Michigan. *Id*. at *4. Furthermore, the court found that given the geographical diversity of the plaintiffs and the fact that defendant had its principal place of business in North Carolina, the convenience factor weighed in favor of the defendant. *Id*. at *5. Next, the court found that Michigan was not centrally located to the potential plaintiffs and that the Western District did not have a hub airport that would be convenient to out-of-state parties and witnesses. *Id*.

In *Nat'l Guardian Risk Retention Group v. Cent. Illinois Emergency Physicians, LLP*., No. 06-247, 2006 WL 1892529 (W.D. Mich. July 10, 2006) (unpublished), the plaintiff insurance company sued a limited liability partnership and individual doctors for a declaratory judgment on the interpretation of an insurance contract, arising out of a death of a hospital patient in the Central District of Illinois. The Michigan partnership agreed with the plaintiff that venue was proper in the Western District of Michigan. *Id*. at *1. The plaintiff was incorporated and had its principal place of business in Hawaii. *Id*. The defendant doctors argued that key witnesses involved in the underlying malpractice action resided in the Central District of Illinois. *Id*. at *3. The court rejected that argument, finding that the relevant issue was the interpretation of the contract itself, not the merits of the malpractice action. *Id*. Furthermore, the court found that document transfer would not be a problem for the purposes of venue. *Id*. at *4. Next, the

court found that a transfer to the Central District of Illinois would merely "shift the cost from one party to another." *Id*. Finally, the court recognized that although under FRCP 45(e), parties may not compel witnesses that reside over 100 miles away to testify, there were alternative means of compliance, such as taking depositions. *Id*.

In *Tri-Con*, none of the plaintiffs resided, purchased their vehicles, or signed any contracts in the State of Michigan. Since the plaintiffs were from a geographically diverse area, there was no convenience to litigating the suit in Michigan. However, this is not the case here. NACHI alleges that several important witnesses reside in Michigan and some of the facts underlying the case arose in the state. Therefore, *Tri-Con* is not entirely analogous to the instant case.

The Court does not find that *National Guardian* presents a helpful analogy to NACHI's argument. In that case, the court found that transferring venue to the Central District of Illinois would only shift the burden from the defendants to the plaintiffs. In the instant case, NAHI claims that some of its "key" witnesses for the prosecution of its case reside in Michigan. The only reason for transfer of venue to Colorado would be to accommodate NACHI. Therefore, to transfer venue would only work to shift the burden to NAHI from NACHI. Accordingly, NACHI's arguments are not sufficient for transfer of venue.

        e.      Interests of Justice

NACHI argues that the Court can alternatively decide to transfer venue under 28 U.S.C. § 1406(a) that permits a court to transfer a case in the "interest of justice." The Sixth Circuit has held that § 1406(a) claims should only be evaluated where the defect alleged is improper venue. *Martin v. Stokes*, 623 F.2d 469, 474 (6th Cir. 1980). For the reasons stated above, the Court finds that venue is proper in the Eastern District of Michigan.

**III.**     **CONCLUSION**

The Court **DENIES** Defendant's Motion to Dismiss for Lack of Personal Jurisdiction.

The Court **DENIES** Defendant's Motion for Change of Venue.

**SO ORDERED.**


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  October 31, 2006

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on October 31, 2006.


s/Denise Goodine
Case Manager